1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PROTEOTECH, INC., a Washington
Corporation,

          Plaintiff,

     v.

UNICITY INTERNATIONAL, INC., a Utah
corporation, et al.,

          Defendants.

Case No.  C06-1297Z

ORDER

9

10

11

12

13

14

15

16        THIS MATTER comes before the Court on Rexall Sundown, Inc.'s motion to dismiss the

17 three causes of action asserted against it by ProteoTech, Inc.  Having reviewed all papers filed in

18 support of and in opposition to the motion, the Court does hereby ORDER:

19 (1)    Rexall Sundown, Inc.'s motion to dismiss, docket no. 66, is GRANTED IN PART and

20        DENIED IN PART;

21 (2)    ProteoTech, Inc.'s claim for indemnification (Count VIII) is DISMISSED with prejudice,

22        ProteoTech, Inc.'s patent infringement claim (Count II) is LIMITED to United States

23        Patent No. 6,264,994, and in all other respects, Rexall Sundown, Inc.'s motion is

24        DENIED; and

25 (3)    The Clerk is directed to send a copy of this Order to all counsel of record.

26

ORDER - 1

1  **Background**

2      In June 1997, the University of Washington granted an exclusive licence to ProteoTech,

3  Inc. ("ProteoTech") for technology that subsequently ripened into United States Patent

4  No. 6,264,994 (issued July 24, 2001) ("the '994 patent") and United States Patent No. 6,939,570

5  (issued September 6, 2005) ("the '570 patent").  Amended Complaint at ¶¶ 12, 13, & 15 (docket

6  no. 51) (copy attached as Exh. A to Motion to Dismiss (docket no. 66)).  In September 1998,

7  ProteoTech granted an exclusive, limited field of use, licence to Rexall Sundown, Inc.

8  ("Rexall") with respect to the technology protected by both patents.  *Id.* at ¶ 18; *see also*

9  Response at 3 n.2 (docket no. 70).  Through various corporate acquisitions and mergers, Rexall

10  Showcase, Inc. (a subsidiary of Rexall) was combined with another company (Enrich

11  International, Inc.) and then purchased by an entity that eventually took the name Unicity

12  International, Inc. ("Unicity").  Amended Complaint at ¶ 20.  In July 2003, Rexall granted a

13  non-exclusive, transferable sublicense to Unicity's predecessor.  *Id.* at ¶ 26; *see* Technology

14  Sublicense Agreement at ¶ 2.1, Exh. C to Motion to Dismiss (docket no. 66).  Unicity

15  manufactures and sells a product under the name CognoBlend Herbal Supplement.  Amended

16  Complaint at ¶ 22.  Marketing materials state that "CognoBlend is patented under" the '994

17  patent; the label indicates that "CognoBlend with PTI-00703 is under U.S. patent pending."  *Id.*

18  at ¶ 24.  "PTI-00703" is a registered trademark, in which ProteoTech retains all rights despite its

19  lack of use.  *Id.* at ¶¶ 16 & 17.  ProteoTech asserts that Rexall had no authority to sublicense the

20  technology at issue to Unicity, and it has alleged against Rexall the following causes of action:

21  patent infringement, contributory trademark infringement, and indemnity.  *Id.* at Counts II, IV,

22  and VIII.  Rexall has moved to dismiss all three of ProteoTech's claims pursuant to

23  Rule 12(b)(6); Rexall has not moved for relief as to the third-party complaint brought against it

24  by Unicity.

25  ///

26  ///

ORDER - 2

1  ///

2  **Discussion**

3  **A.      Standard for Motion to Dismiss**

4  Although a complaint challenged by a Rule 12(b)(6) motion to dismiss need not provide

5  detailed factual allegations, it must offer "more than labels and conclusions" and contain more

6  than a "formulaic recitation of the elements of a cause of action."  *Bell Atlantic Corp. v.*

7  *Twombly*, 127 S. Ct. 1955, 1964-65 (2007).  The complaint must indicate more than mere

8  speculation of a right to relief.  *Id.* at 1965.  When a complaint fails to adequately state a claim,

9  such deficiency should be "exposed at the point of minimum expenditure of time and money by

10  the parties and the court."  *Id.* at 1966.  A complaint may be lacking for one of two reasons:

11  (i) absence of a cognizable legal theory, or (ii) insufficient facts under a cognizable legal claim.

12  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  In ruling on a

13  motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all

14  reasonable inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561

15  (9th Cir. 1987).  The question for the Court is whether the facts in the complaint sufficiently

16  state a "plausible" ground for relief.  *Twombly*, 127 S. Ct. at 1974.  If the Court considers

17  matters outside the complaint, it must convert the motion into one for summary judgment.  Fed.

18  R. Civ. P. 12(d).  If the Court dismisses the complaint or portions thereof, it must consider

19  whether to grant leave to amend.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

20  **B.      Patent Infringement**

21  Rexall contends that "as a matter of law, the mere act of licensing does not constitute

22  inducement of infringement."  Motion to Dismiss at 6 (docket no. 66).  For support, Rexall cites

23  two cases: *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990), and

24  *TorPharm Inc. v. Novopharm Ltd.*, 48 U.S.P.Q.2d 1471 (E.D.N.C. 1998).  Neither case stands

25  for the broad proposition stated.

26  In *Hewlett-Packard*, the plaintiff and the defendant each held patents for similar

ORDER - 3

1    technology; Hewlett-Packard Company ("HP") was the assignee of the "LaBarre patent," while

2    Bausch & Lomb Incorporated ("B&L") was the assignee of the "Yeiser patent."  909 F.2d at

3    1465-66.  Both the LaBarre patent and the Yeiser patent described the mechanism for feeding

4    paper through an X-Y plotter.  *Id.* at 1466.  In late 1982 or early 1983, B&L began selling,

5    through its Houston Instruments division, a form of X-Y plotter that used the technology

6    protected by the LaBarre patent.  *Id.* at 1467.  In September 1985, B&L sold the Houston

7    Instruments division to Ametek, Inc. ("Ametek") for $43 million and concurrently executed an

8    agreement pursuant to which it granted to Ametek a license under the Yeiser patent.  *Id.*  HP

9    sued B&L for direct infringement during the period preceding the sale to Ametek and for

10   inducement of infringement for the subsequent time frame.  *Id.*  In its defense, B&L challenged

11   the validity of the LaBarre patent in light of the earlier Yeiser patent and denied that its sale of

12   the Houston Instruments division and related activities constituted inducement of infringement.

13   *Id.*  The Federal Circuit affirmed the district court's ruling that the LaBarre patent was valid and

14   that B&L was not liable for infringement subsequent to the sale of the Houston Instruments

15   division.  *Id.* at 1468-70.  As to the latter issue, the Federal Circuit clarified that an element of

16   infringement by inducement (a form of direct infringement, also known as "active inducement")

17   is "proof of actual intent to cause the acts which constitute infringement."  *Id.* at 1469.  The

18   Federal Circuit then examined the "totality of events" and concluded that B&L "was merely

19   interested in divesting itself of Houston Instruments at the highest possible price."  *Id.*  It found

20   that the grant of a license from B&L to Ametek under the Yeiser patent was not probative of any

21   intent to induce infringement; rather the license "merely freed Ametek from whatever bar the

22   Yeiser patent would have been."  *Id.* at 1470.  The license could not and did not purport to

23   insulate Ametek from the effect of other patents, including the LaBarre patent.  *See* *id.*

24          The *Hewlett-Packard* case is both distinguishable and not accurately interpreted by

25   Rexall.  In *Hewlett-Packard*, the license granted by B&L to Ametek involved a patent different

26   from the one HP accused B&L of infringing or inducing Ametek to infringe.  No allegation was

 ORDER - 4

1   made in that case that B&L lacked the authority or right to grant Ametek a license in the Yeiser

2   patent.  The license under the Yeiser patent was simply not meaningful evidence concerning

3   B&L's intent to induce Ametek to infringe the LaBarre patent.  In contrast, here, Rexall has

4   granted a sublicense to Unicity concerning the same patent ProteoTech alleges that both Rexall

5   and Unicity have infringed.  ProteoTech challenges Rexall's ability to grant such sublicense, and

6   the sublicense therefore has some relevance concerning Rexall's intent, at least with regard to

7   the '994 patent, which predates the sublicense.  Moreover, the *Hewlett-Packard* opinion does

8   not suggest that licensing alone could never be adequate evidence of the requisite intent; rather,

9   the Federal Circuit examined all of the evidence in that case and concluded that B&L's intent

10  was not to infringe HP's patent, but rather to get rid of Houston Instruments "lock, stock, and

11  barrel."  *Id.* at 1469, 1470.  Here, however, the Court cannot conclude with any degree of

12  certainty that ProteoTech has not presented a "plausible" basis for finding Rexall had the

13  requisite intent for an infringement by inducement claim.

14      The *TorPharm* case is even further off point.  In that case, the plaintiff TorPharm Inc.

15  ("TorPharm") had sued Novopharm, Ltd. ("Novopharm") for infringement of TorPharm's patent

16  for the drug ranitidine hydrochloride (the generic name for Zantac), and it was seeking leave to

17  join as a defendant Genpharm Inc. ("Genpharm").  48 U.S.P.Q.2d at 1472-73.  Genpharm did

18  not manufacture or import ranitidine hydrochloride on behalf of Novopharm, and it did not

19  know the chemical properties of Novopharm's version or the manufacturing processes used by

20  Novopharm or its subsidiary, Granutec, Inc.  *Id.* at 1472-73.  The only connection between

21  Genpharm and Novopharm was apparently a negotiated waiver submitted by Genpharm to the

22  Food and Drug Administration ("FDA") pursuant to which the FDA approved Novopharm's

23  Abbreviated New Drug Application ("ANDA") despite Genpharm's statutory right to

24  exclusivity.  *Id.* at 1472.  A company may not market a generic drug without the FDA's approval

25  of its ANDA, and an award of exclusivity guarantees that the FDA will not grant approval of

26

ORDER - 5

1   another company's ANDA for the same product until the statutory 180-day period expires.  *Id.*

2   In denying TorPharm's motion for leave to amend its complaint, the District Court observed:

3       Genpharm only notified the FDA that it waived exclusivity as to Granutec.  This
        waiver of exclusivity itself did not allow Novopharm to enter the United States
4       ranitidine hydrochloride market because the FDA still had to approve Granutec's
        ANDA.  The removal of a regulatory barrier by Genpharm which permitted the
5       FDA to approve Novopharm's ANDA does not give rise to liability for
        contributory infringement.
6
*Id.* at 1474.  The District Court further held that TorPharm's motion for leave to amend its
7
complaint was futile because it did not allege facts necessary to show that Genpharm had the
8
requisite intent for infringement by inducement.  *Id.*  The proposed amended complaint did not
9
allege on Genpharm's part any knowledge of Novopharm's product or process, any control over
10
the manufacture, import, sale, or use of Novopharm's product, or any involvement with
11
Novopharm's conduct, other than compensation received in exchange for the waiver submitted
12
to the FDA.  *Id.*
13
        Like the *Hewlett-Packard* case, the *TorPharm* opinion concerns different facts and a
14
limited holding.  Unlike the case before the Court, *TorPharm* did not involve a license or
15
sublicense, but rather a waiver of a statutory entitlement.  The waiver did not ensure FDA
16
approval of the ANDA at issue, and it did not speak to the effect of any patent concerning
17
ranitidine hydrochloride.  In addition, the *TorPharm* decision does not support Rexall's broadly
18
worded argument; at most, the case stands for the proposition that a complete absence of facts
19
demonstrating involvement on the part of the proposed defendant does not warrant joinder.
20
Here, in contrast, ProteoTech alleges that Rexall had a subsidiary relationship with the company
21
that through various acquisitions became part of the corporate entity now accused of infringing
22
the patent ProteoTech licensed to Rexall.  The case now before the Court is simply not one in
23
which the alleged inducer had no connection to the alleged infringer, and Rexall's "mere
24
licensing" theory does not support dismissal of ProteoTech's claim of patent infringement.
25

26

ORDER - 6

1    Rexall also makes the more limited contention that because the '570 patent was not

2 issued until after the sublicense was granted to Unicity, Count II should be dismissed in part as

3 to the '570 patent.  ProteoTech does not appear to contest this point.  *See* Response at 3 n.2

4 (docket no. 70) ("ProteoTech does not dispute that it cannot assert a[n] inducement of

5 infringement claim against Rexall based on the '570 patent because that patent was issued after

6 the date of the Sublicense and termination of the License Agreement.").  ProteoTech maintains,

7 however, that it can assert infringement by inducement as to the '994 patent, and Rexall does not

8 appear to disagree with ProteoTech's interpretation of the technology purportedly granted by the

9 sublicense to Unicity.  The sublicense provides that the term "Licensed Technology" has the

10 same meaning ascribed by the license agreement between ProteoTech and Rexall.  *See*

11 Technology Sublicense Agreement at ¶ 1.2, Exh. C to Motion to Dismiss (docket no. 66).  The

12 "Licensed Technology" is therefore defined as

13    the subject matter within the claims of U.S. Patent Application serial number
     09/079,829, entitled 'COMPOSITION AND METHODS FOR TREATING ALZHEIMER'S
14    DISEASE AND OTHER AMYLOIDOSES,' including PTI-00703 and also including
     (i) **subsequently filed applications on the same subject matter** or on PTI-00703,
15    and (ii) all corresponding PCT and other foreign applications, and all divisions,
     continuations, continuations-in-part thereof, together with all patents and reissues
16    issued thereon, but only as and to the extent that they relate to and may be used in
     the Field.

17

18 License Agreement at ¶ 1.5, Exh. B to Motion to Dismiss (emphasis added).  "Field" is defined

19 as "dietary supplement use for Alzheimer's disease and Type II diabetes."  *Id.* at ¶ 1.3.  Patent

20 Application serial number 09/079,829 matured into the '570 patent.  Amended Complaint at

21 ¶ 18.  According to ProteoTech, the '994 patent ripened from a subsequently filed application on

22 the same subject matter.  Response at 3 n.2.  Rexall has provided no argument to the contrary.

23 Therefore, the Court DENIES Rexall's motion to dismiss Count II, but LIMITS the claim to the

24 '994 patent.

25 ///

26 ///

ORDER - 7

1

**C.     Trademark Infringement**

2          ProteoTech alleges that Unicity has used and continues to use the trademark "PTI-00703"

3    to market its products and that Unicity is not authorized to do so via "license or otherwise."

4    Amended Complaint at ¶ 29 (docket no. 51).  Rexall contends that, because the sublicense did

5    not grant Unicity any rights to use the mark "PTI-00703," it cannot be held liable for

6    contributory trademark infringement.  Rexall relies on the following provision of the sublicense:

7               Nothing contained in this Agreement shall be construed as . . . conferring any
               license or right with respect to any trademark, trade or brand name, or corporate
8               name of either party or Licensor, or any other name or mark, or contraction,
               abbreviation or simulation thereof . . . .

9
     Technology Sublicense Agreement at ¶ 5.3.3, Exh. C to Motion to Dismiss (docket no. 66).  The

10   term "Licensor" refers to ProteoTech.  *Id.* at Preamble.  In response, ProteoTech explains that it

11   is not relying on the sublicense as evidence of Rexall's wrongdoing, but rather on the chain of

12   events pursuant to which Unicity continued marketing its product with the brand "PTI-00703."

13   ProteoTech alleges that "Rexall knew or should have known that Unicity was using the PTI-

14   00703 mark" and "granted Unicity an implied license to continue advertising and promoting

15   sales of the Infringing Products through use of the PTI-00703 mark."  Amended Complaint at

16   ¶ 30.  Although the details are sparse, ProteoTech appears to have alleged sufficient facts to

17   present a plausible claim of contributory trademark infringement, which requires proof that the

18   defendant "'intentionally induced' the primary infringer to infringe," *Perfect 10, Inc. v. Visa*

19   *Internat'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007), and the Court DENIES Rexall's

20   motion to dismiss Count IV.

21   **D.     Indemnification**

22          Rexall moves to dismiss ProteoTech's claim for indemnification on two grounds:  (i) the

23   license agreement does not require Rexall to indemnify ProteoTech as to an action ProteoTech

24   filed; and (ii) the license agreement requires arbitration of all disputes other than those related to

25   the enforcement of intellectual property rights.  Rexall relies on the following provisions of the

26

ORDER - 8

1  parties' agreement:

2      Rexall agrees to defend, indemnify and hold ProteoTech, its officers, founders,
       directors, employees or agents harmless from and against any and all claims,
3      damages, expenses and losses (including reasonable attorneys' fees) or liability to
       any third party resulting from any act or omission by Rexall relating to Rexall's
4      performance hereunder.

5  License Agreement at ¶ 6.2, Exh. B to Motion to Dismiss (docket no. 66).

6      All disputes arising out of or under this Agreement - other than disputes related to
       the enforcement of its intellectual property rights by ProteoTech - shall be
7      submitted to binding arbitration by the American Arbitration Association (AAA) to
       be heard in Palm Beach County, Florida if proceedings are initiated by ProteoTech
8      and King County, Washington if proceedings are initiated by Rexall, under the
       rules then in force.

9
   *Id.* at ¶ 12.4.  The License Agreement is governed by Florida law.  *Id.* at ¶¶ 12.2 & 14.
10
        Rexall construes the agreement as calling for indemnification only with respect to the
11
   claims of third parties.  ProteoTech argues that the indemnification clause governs any and all
12
   claims resulting from Rexall's acts or omissions **or** liability to third parties.  ProteoTech also
13
   contends that, to the extent the agreement is ambiguous, interpretation is an issue for the jury.
14
   ProteoTech's reading of the indemnification provision, however, is simply unreasonable.  "A
15
   contract for indemnity is an agreement by which the promisor agrees to protect the promisee
16
   against loss or damages by reason of liability to a third party."  *Dade County Sch. Bd. v. Radio*
17
   *Station WQBA*, 731 So.2d 638, 643 (Fla. 1999).  ProteoTech's interpretation would transform
18
   the indemnification clause into a blank check to sue and collect attorneys' fees, and the Court
19
   rejects ProteoTech's argument.  *See Florida State Bd. of Admin. v. Law Eng'g & Envtl. Serv.,*
20
   *Inc.*, 262 F. Supp. 2d 1004, 1021 (D. Minn. 2003) (applying Florida law to grant summary
21
   judgment against plaintiff's claim for indemnification "because plaintiff does not allege that a
22
   third party has asserted a claim against it").  The Court concludes that the indemnification
23
   provision at issue is unambiguous and is limited to claims or liability "to any third party."
24
   Moreover, the Court is persuaded that any dispute concerning indemnification falls squarely
25

26

   ORDER - 9

1  within the arbitration clause of the parties' agreement.  Thus, the Court GRANTS Rexall's

2  motion to dismiss Count VIII.

3  **Conclusion**

4       For the foregoing reasons, Rexall's motion to dismiss is GRANTED IN PART and

5  DENIED IN PART.  ProteoTech's claim for indemnification (Count VIII of the Amended

6  Complaint) is DISMISSED with prejudice, and ProteoTech's claim against Rexall for patent

7  infringement (Count II of the Amended Complaint) is LIMITED to actions related to United

8  States Patent No. 6,264,994.  In all other respects, Rexall's motion is DENIED.

9       IT IS SO ORDERED.

10      DATED this 27th day of February, 2008.

11

12

_____
Thomas S. Zilly
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER - 10