UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PROTEOTECH, INC., a Washington Corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>UNICITY INTERNATIONAL, INC., a Utah corporation, et al.,<br><br>  Defendants. | Case No. C06-1297Z<br><br>ORDER |

THIS MATTER came before the Court on cross-motions for partial summary judgment brought by plaintiff, ProteoTech, Inc. ("ProteoTech"), and defendant / third-party defendant, Rexall Sundown, Inc. ("Rexall"). The Court heard oral argument on the motions and issued a separate Minute Order denying both motions due to the existence of genuine issues of material fact. The Court now enters the following order to address a legal issue raised in the motions. For the reasons discussed herein, the Court HOLDS, as a matter of law, that an exclusive patent licensee may not grant a sublicense without the consent of the licensor or express authorization in the license.

ORDER - 1

**Background**

In September 1998, ProteoTech granted to Rexall an exclusive, limited field of use licence with respect to

> the claims of U.S. Patent Application serial number 09/079,829, entitled "COMPOSITION AND METHODS FOR TREATING ALZHEIMER'S DISEASE AND OTHER AMYLOIDOSES," including PTI-00703 and also including (i) subsequently filed applications on the same subject matter or on PTI-00703, and (ii) all corresponding PCT and other foreign applications, and all divisions, continuations, continuations-in-part thereof, together with all patents and reissues issued thereon, but only as and to the extent that they relate to and may be used in the Field.

License Agreement at ¶ 1.5, Exh. B to McCurley Decl. (docket no. 75). The "Field" is defined as "dietary supplement use for Alzheimer's disease and Type II diabetes." _Id._ at ¶ 1.3. The patent application described in the License Agreement eventually matured into United States Patent No. 6,939,570 ("the '570 patent"). Exh. B to Complaint (docket no. 1). Over four years earlier, United States Patent No. 6,264,994 ("the '994 patent") had ripened from Patent Application No. 09/208,278, which was a continuation-in-part of the application referenced in the License Agreement. Exh. A to Complaint. The parties do not dispute that the License Agreement concerns both the '570 patent and the '994 patent.

Except in the event of settling an infringement action,[1] the License Agreement contains no express provision concerning Rexall's ability to sublicense the technology. The License Agreement, however, does include an express provision concerning assignment, which states: "This Agreement may not be assigned by either party without the approval of the other, except that (i) Rexall's rights under Section 3 above may be assigned and (ii) this Agreement may be assigned to a successor of the assigning party's entire business." License Agreement at ¶ 16, Exh. B to McCurley Decl. The License Agreement is expressly governed by Florida law. _Id._ at ¶¶ 12.2 & 14.

---

[1] In conjunction with the settlement of an infringement claim, Rexall was provided "the sole right . . . to sublicense any alleged infringer solely within the Field for use, inclusive of past use." License Agreement at ¶ 11.7, Exh. B to McCurley Decl. (docket no. 75).

ORDER - 2

At the time the License Agreement was executed, Rexall had a subsidiary, Rexall Showcase, Inc., through which it sold three products that incorporated the technology at issue, namely Neurosharp, Cat's Claw Complex, and CognoBlend.  Bangerter Decl. at ¶¶ 6 & 7 (docket no. 85).  CognoBlend was the most successful of the three products.  *Id.* at ¶ 7; *see also* Tolman Decl. at ¶ 4 (docket no. 87).  Through various acquisitions and mergers, Rexall Showcase, Inc. and another company (Enrich International, Inc.) were placed under common ownership of a corporation other than Rexall, and subsequently purchased by an entity that eventually took the name Unicity International, Inc. ("Unicity").

Contemporaneous with these corporate changes, Douglas Whitehead, then Associate General Counsel for Unicity Network, Inc. (formerly Enrich International, Inc.), began a string of e-mails concerning the technology license related to CognoBlend.  *See* Exh. C to Praecipe and Corrected Shearer Decl. [hereinafter "Shearer Decl."] (docket no. 90).  The messages culminated in a request by Ken Strick, then Rexall's Vice President for Legal Affairs and Assistant General Counsel, for Unicity to prepare a sublicense agreement for Rexall's review.  *Id.*  Mr. Whitehead had earlier committed to contacting ProteoTech to request approval of an assignment.  *Id.*  According to Dennis McCurley, the Chief Operating Officer and Chief Financial Officer for ProteoTech, ProteoTech was never "contacted by Rexall" (or presumably, Unicity) concerning an assignment or sublicense to Unicity.  McCurley Decl. at ¶ 11.

In July 2003, Rexall granted a non-exclusive, transferable sublicense to Unicity's predecessor, Unicity Acquisition Corporation.  Exh. D to Shearer Decl.  Thereafter, Unicity continued to manufacture and sell CognoBlend, using marketing materials stating that "CognoBlend is patented under" the '994 patent, as well as labels indicating the "CognoBlend with PTI-00703 is under U.S. patent pending."  Amended Complaint at ¶ 24 (docket no. 51).  In September 2006, ProteoTech filed this action against Unicity, alleging patent infringement, trademark infringement, false designation of origin, false advertising, and violation of the Washington Consumer Protection Act.  Complaint (docket no. 1).  With leave of the Court,

ORDER - 3

1 ProteoTech later amended its complaint to add claims against Rexall for patent infringement and
2 contributory trademark infringement. ProteoTech and Rexall subsequently filed cross-motions
3 for partial summary judgment raising *inter alia* the issue the Court now addresses.

4 **Discussion**

5      ProteoTech contends that, as a matter of law, Rexall had no authority to grant Unicity a
6 sublicense. Because the License Agreement contains ambiguities, raising genuine issues of
7 material fact concerning the intent of the parties, and because Rexall has presented a factual
8 question regarding whether it had a right independent of the License Agreement to grant a
9 sublicense to Unicity, the Court has denied ProteoTech's motion for partial summary judgment.
10 On the narrower issue, however, of what legal standard governs the granting of sublicenses, the
11 Court provides the following analysis.

12      The parties agree that the question before the Court is one of first impression pursuant to
13 the Patent Act of 1952, which significantly changed the then-existing law. *See Dawson Chem.*
14 *Co. v. Rohm & Haas Co.*, 448 U.S. 176, 203-04 (1980). The Federal Circuit has not addressed
15 the issue, and the Ninth Circuit has specifically acknowledged that whether an exclusive
16 licensee may transfer rights absent consent of the licensor or an express provision in the license
17 remains an open question. *In re Catapult Entm't Inc.*, 165 F.3d 747, 750 n.3 (9th Cir. 1999).
18 Under the Patent Act of 1952, a patentee is granted the "right to exclude others from making,
19 using, offering for sale, or selling" the invention at issue or, if the invention is a process,
20 products made via the process at issue. 35 U.S.C. § 154(a)(1). Patents generally have the
21 attributes of personal property and may be assigned or licensed, but only by written instrument.
22 35 U.S.C. § 261.

23      An important value of a patent is the power to control for a period of time the identity of
24 those who may compete with the patentee and/or exploit the invention described in the patent.
25 *See, e.g.*, *Oliver v. Rumford Chem. Works*, 109 U.S. 75, 83 (1883) (observing that the licensor
26 selected the exclusive licensees "because of their personal ability or qualifications to make or

ORDER - 4

furnish a market" for the products at issue).  Courts are almost uniform in holding that free assignability of non-exclusive licenses undermines the rights associated with a patent because the patentee "would lose the very important ability to control the *identity* of its licensees."  *In re CFLC, Inc. (Everex Sys., Inc. v. Cadtrak Corp.)*, 89 F.3d 673, 679 (9th Cir. 1996) (emphasis in original).  For this reason, the Ninth Circuit has concluded that a "non-exclusive licensee of a patent has only a personal and not a property interest in the patent . . . , [which] cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment."  *Id.*; *see also* *Unarco Indus., Inc. v. Kelley Co.*, 465 F.2d 1303 (7th Cir. 1972).  This ruling was predicated on a determination that federal law governs the assignability of patent licenses due to the need for uniformity to adequately promote the policies underlying the patent laws.  89 F.3d at 677-79.

At least one court has extended this analysis to exclusive licenses.  *See* *In re Hernandez*, 285 B.R. 435 (Bankr. D. Ariz. 2002); *see also* *In re Aerobox Composite Structures, LLC*, 373 B.R. 135, 141 (Bankr. D.N.M. 2007) ("Federal patent law generally prohibits assignment of both exclusive and non-exclusive license agreements absent consent of the licensor.").  *But see* *Moraine Prods. v. ICI Am., Inc.*, 538 F.2d 134, 141 (7th Cir. 1976) ("Where the patentee or his assignee has granted an absolute exclusive license, the exclusive licensee usually has the authority to grant sublicenses.").  In *In re Hernandez*, the Arizona Bankruptcy Court concluded that, under federal patent law, the licensor's consent to assignment is required even if the license is exclusive.  285 B.R. at 440.  The Arizona Bankruptcy Court saw no basis for distinguishing in this context between exclusive and non-exclusive licenses, observing that free assignability would result in a patent holder losing control over the identity of its licensees whenever the license was exclusive and would "effectively treat[] the grant of an exclusive license as the equivalent of an outright assignment," which would run contrary to the careful distinctions between licenses and assignments made by federal patent jurisprudence.  *Id.* at 439-40.

This Court agrees with the Arizona Bankruptcy Court that the rationale for requiring

ORDER - 5

1 actual or constructive consent of the licensor applies regardless of whether the license is
2 exclusive or non-exclusive.  Although, in granting an exclusive license, the licensor relinquishes
3 the ability to provide additional licenses, nothing about that act implies or necessitates the
4 licensor's forfeiture of the right to control which or how many entities practice the art at issue.
5 The Court is not persuaded otherwise by Rexall's contention that free assignability would have
6 inured only to ProteoTech's benefit by generating additional royalties.  Such argument is
7 specific to the facts of this case, and it does not address the broader concerns underlying the
8 patent laws.  An exclusive license need not be structured in the same manner as here,[2] and a
9 licensor might have concerns other than royalties or profit, like maintaining a certain level of
10 quality or a consistent level of production.  Thus, the Court HOLDS that the type of license,
11 exclusive or non-exclusive, does not affect assignability; in either event, the licensor must
12 consent to, or the license must expressly allow, sublicensing.  Here, due to the ambiguities in the
13 License Agreement, the Court cannot decide as a matter of law whether the sublicense granted
14 by Rexall to Unicity was otherwise valid, and the cross-motions for partial summary judgment
15 have been denied.

16    IT IS SO ORDERED.

17    DATED this 19th day of March, 2008.

_____
Thomas S. Zilly
United States District Judge

---

[2] The Court notes that, in granting a license that was exclusive only within a specific field of use, ProteoTech reserved the ability to practice or license the art in other arenas.  Indeed, Rexall has conceded that ProteoTech licensed to Rexall "less than ProteoTech's full package of rights."  Rexall's Supp. Brief at 2 (docket no. 103).  Thus, ProteoTech's license to Rexall bears more similarity to a non-exclusive license than to an exclusive license for all uses.  This case-specific attribute of the license lends further support to the Court's conclusion that more than just the designation of exclusivity was required to authorize sublicensing.